[940 NE2d 547, 914 NYS2d 721]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MORDEKHAY LEVY, Appellant.

Argued October 19, 2010; decided November 18, 2010

**POINTS OF COUNSEL**

*Stillman, Friedman & Shechtman, P.C.,* New York City (*Nathaniel Z. Marmur* and *Paul Shechtman* of counsel), for appellant. I. The trademark registration must cover the goods offered for sale. (*People v Dione,* 25 Misc 3d 127[A], 2009 NY Slip Op 52056[U]; *People v Guo Zhang,* 14 Misc 3d 82; *People v Reyes,* 9 Misc 3d 136[A], 2005 NY Slip Op 51699[U]; *People v Lynch,* 8 Misc 3d 126[A], 2005 NY Slip Op 50894[U]; *People v Yue Lin,* 11 Misc 3d 1091[A], 2006 NY Slip Op 50821[U]; *People v Thiam,* 189 Misc 2d 810; *People v Jobe,* 20 Misc 3d 1114[A], 2008 NY Slip Op 51346[U]; *Torres v Cantine Torresella S.r.l.,* 808 F2d 46; *People v Wangdu,* 20 Misc 3d 1132[A], 2008 NY Slip Op 51709[U]; *United States v Giles,* 213 F3d 1247.) II. The trial court did not properly instruct the jury. (*U.S. Structures, Inc. v J.P. Structures, Inc.,* 130 F3d 1185; *People v Flynn,* 79 NY2d 879; *People v Ford,* 11 NY3d 875; *People v Brown,* 278 AD2d 177; *People v Daly,* 244 NY 278; *People v Watts,* 57 NY2d 299; *People v Haddock,* 48 AD3d 969.)

*Richard A. Brown, District Attorney,* Kew Gardens (*Edward D. Saslaw* and *John M. Castellano* of counsel), for respondent. The evidence supporting defendant's conviction was legally

sufficient under the trademark counterfeiting statute, and the court properly instructed the jury as to the elements of that crime. (*S.C. Johnson & Son v Johnson*, 175 F2d 176; *Steele v Bulova Watch Co.*, 344 US 280; *Two Pesos, Inc. v Taco Cabana, Inc.*, 505 US 763; *People v Hawkins*, 11 NY3d 484; *People v Gray*, 86 NY2d 10; *People v Hines*, 97 NY2d 56; *People v Ford*, 66 NY2d 428; *People v Cona*, 49 NY2d 26; *People v Smith*, 79 NY2d 309; *People v Finley*, 10 NY3d 647.)

**OPINION OF THE COURT**

READ, J.

In October 2004, police executed a search warrant against Black & Yellow Major Auto Parts, a business owned by defendant Mordekhay Levy, to find and seize counterfeit parts for Ford vehicles. The search, which was conducted by a detective and a brand-protection employee from Ford, turned up a variety of allegedly counterfeit parts, which were immediately seized.

Roughly at the same time, Ford filed suit against Levy for trademark infringement arising from the sale of counterfeit parts, and the court issued a temporary restraining order. In November 2004, at the invitation of Levy's attorney, the brand-protection employee and Ford's trademark attorneys visited Black & Yellow's warehouse on a Friday and the following Tuesday to identify parts that were not genuine Ford parts. Following these visits, Levy entered into a stipulated preliminary injunction that prohibited him and his business from

> "manufacturing, advertising, offering for sale, selling or distributing automotive parts or any related products or services having or bearing any trademark of Ford, Ford Motor, Ford Motor Company, Ford blue oval, racing car, speeding car design, Motorcraft, Lincoln Star, or Lincoln certified or any Ford part number or any other mark or design that's likely to cause confusion with any marks that are specifically listed in this order."[1]

Subsequent search warrants were issued and executed in October 2005 and July 2006, both of which resulted in the confiscation of allegedly counterfeit parts from Black & Yellow's warehouse. As a consequence, Levy was eventually indicted and

---

1. This is the description of the preliminary injunction given by Ford's outside trademark attorney at Levy's trial for trademark counterfeiting. The injunction was admitted into evidence, but was not included in the record on appeal.

tried before a jury for second-degree trademark counterfeiting (Penal Law § 165.72). A person is guilty of this crime

> "when, with the intent to deceive or defraud some other person or *with the intent to evade a lawful restriction* on the sale, resale, offering for sale, or distribution of goods, he or she manufactures, distributes, sells, or offers for sale goods which bear a counterfeit trademark, or possesses a trademark knowing it to be counterfeit for the purpose of affixing it to any goods, and the retail value of all such goods bearing counterfeit trademarks exceeds one thousand dollars" (*id.* [emphasis added]).

The People's trial witnesses identified parts seized in the 2005 and 2006 raids as counterfeit in several ways. In some cases, the products were not manufactured by Ford (or its aftermarket brand, Motorcraft), but nevertheless bore a Ford product number; in other cases, the products bore a Ford trademark (e.g., the familiar "Ford oval"), but were tagged as fake because of their packaging. There was evidence presented to show that Levy had purchased and sold the purportedly genuine parts at less than the cost to a Ford dealer. Additionally, Ford's chief trademark counsel testified that the trademarks alleged to be counterfeit were registered and in use. Through him, the People introduced evidence regarding 34 trademarks claimed to be in full force and effect.

After the People rested, Levy moved to dismiss on the ground that a majority of the parts—7 of the 12 parts charged in count one, and both of the parts charged in count two of the indictment—were not covered by the trademark registration certificates introduced into evidence and therefore were not "counterfeit" within the meaning of Penal Law § 165.70. The trial judge reserved decision, and Levy called three witnesses in his defense.

The first witness handled shipping and receiving for Levy's warehouse. He testified about how he separated genuine parts from their aftermarket or off-brand counterparts. The second witness, the co-owner of a wholesale auto parts business, described the genuine "Crown Victoria" tail lights he purchased from Ford and then resold to Levy. The third witness was the former parts manager at a Lincoln-Mercury dealership authorized to sell Ford parts. He testified that Levy was his "top" customer, and that he offered him discounts "[b]ecause of the volume of parts [Levy] bought."

After the close of evidence, Levy asked the trial judge to instruct the jury that an "intent to evade a lawful restriction" on the sale of goods under Penal Law § 165.72 required knowledge that the parts were counterfeit. The trial judge declined this request and elected to "follow the CJI"; he also denied Levy's motion to dismiss. After charging the jury, the trial judge again considered and turned down a request from Levy for what the defense styled a "knowledge charge," explaining that

> "[t]he second element [necessarily] provides for the knowledge because you can't intend to evade a lawful restriction without knowing what it's all about. The knowing is part and parcel of the intention because if you didn't know it, you couldn't intend to evade a lawful restriction."

He added that "the overall purpose of criminal jury instruction is to provide the law as basic and as simple as possible containing all the necessary elements."

The jury convicted Levy of two counts of second-degree trademark counterfeiting. Levy moved to set aside the verdict on the ground that he could not be convicted for trademark counterfeiting if the trademarks in evidence did not cover the specific products allegedly counterfeited. The trial court denied the motion, and Levy was sentenced to a conditional discharge and a $10,000 fine.

The Appellate Division unanimously affirmed. The court concluded that the jury charge was proper as it closely tracked the CJI instruction and "properly conveyed to the jury the correct principles to be applied in evaluating the evidence before it" (65 AD3d 1057, 1058 [2d Dept 2009]). The Appellate Division also held that the evidence was legally sufficient to establish Levy's guilt of trademark counterfeiting. A Judge of this Court granted leave to appeal (13 NY3d 908 [2009]), and we now affirm.

The Penal Law defines a trademark as a mark that is "registered" and "in use" which identifies and distinguishes goods from those manufactured by others (Penal Law § 165.70 [1] [a]). A "counterfeit" mark is simply a "spurious" or "imitation" mark that is used in the trafficking, sale or distribution of goods that are "identical with or substantially indistinguishable from" the genuine article (Penal Law § 165.70 [2]); and "goods" are defined as "products, services, objects, materials, devices or

substances which are identified by the use of a trademark" (Penal Law § 165.70 [4]).[2]

Levy contends that the evidence was insufficient to sustain his conviction because allegedly counterfeited goods seized from his warehouse—a hubcap cover bearing the "Lincoln Star," for example—were not protected by a mark that was in use and registered, and which identified a good. Levy reasons that there would be no crime, for example, if someone affixed the "Ford oval" to a baseball bat: the bat is not "identical with or substantially indistinguishable from a trademark" because Ford does not use the "Ford oval" on baseball bats, and it therefore cannot be "counterfeit" within the meaning of the trademark counterfeiting statute. By parity of reasoning, the hubcap cover bearing the "Lincoln Star" cannot be counterfeit because that particular mark covers cars, structural parts, wheels, and wheel covers, but not hubcaps.

▪ Levy's argument is unpersuasive. As the People observe, statutory interpretation always begins with the words of the statute, and New York's trademark counterfeiting statute is simply not on its face restricted in the way that Levy advocates. By contrast, the definition of "counterfeit" under the federal Trademark Counterfeiting Act does, in fact, reach only those instances in which the counterfeit mark is used in connection with the same goods or services as those for which the mark is registered on the Principal Register at the United States Patent and Trademark Office, and is in use (*see* 18 USC § 2320 [e] [1]

---

**2.** The full text of Penal Law § 165.70, as relevant to this appeal, defines these terms as follows:

"1. The term 'trademark' means (a) any word, name, symbol, or device, or any combination thereof adopted and used by a person to identify goods made by a person and which distinguish them from those manufactured or sold by others which is in use and which is registered, filed or recorded under the laws of this state or of any other state or is registered in the principal register of the United States patent and trademark office . . .

"2. The term 'counterfeit trademark' means a spurious trademark or an imitation of a trademark that is:

"(a) used in connection with trafficking in goods; and

"(b) used in connection with the sale, offering for sale or distribution of goods that are identical with or substantially indistinguishable from a trademark as defined in subdivision one of this section . . .

"4. The term 'goods' means any products, services, objects, materials, devices or substances which are identified by the use of a trademark."

[A] [i]-[iii] [defining "counterfeit mark" as a spurious mark "used in connection with trafficking in any goods (or) services" and "that is identical with, or substantially indistinguishable from, a mark registered . . . and in use" and *"that is applied to or used in connection with the goods or services for which the mark is registered"* (emphasis added)]). But the federal act was adopted in 1984 to create a criminal sanction for trademark infringement, which itself requires that the accused infringer use the mark on the same goods as those for which the mark is registered.

Nonetheless, Levy takes the position that because "[p]ortions of the definitions [in New York's statute] were taken from then-existing federal law" (Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 165.70, at 312-313), we should interpret the state statute as incorporating the federal act's identity-of-goods requirement. But if our Legislature had intended to impose such a limitation, it could have done so easily enough by enacting the relevant language of the federal act in toto. New York's legislators obviously did not make that choice, and we decline to make it for them.

As the People point out, the Legislature's decision not to parrot federal law in this regard and enact an identity-of-goods requirement may "reflect[ ] the understanding that the consumer relies on the mark itself and is not in a position to know or determine the precise product for which the mark is registered." For example, assume that Ford makes brake pads for all of its cars, but that it expressly does not place the familiar "Ford oval" on those pads, and therefore does not register the "Ford oval" trademark for that purpose. If a counterfeiter places the "Ford oval" on brake pads, the use of that mark nevertheless "identifies" the good as a genuine Ford product; in fact, the *lack* of registration for that purpose would seem to be prima facie evidence that the product is, in fact, a counterfeit since Ford never made or even intended to make that product bearing that mark. This is precisely the kind of product that would deceive a consumer because the mark "identifies" the product as a genuine Ford part when it is not.

Moreover, Levy's example of the "Ford oval" appearing on a baseball bat presumes that a buyer would not consider the baseball bat to be a genuine Ford product. With respect to automotive parts, however, the average purchaser expects *any parts* bearing the "Ford oval" to be genuine even if Ford never placed or intended to place that mark on that particular good.

■ Finally, Levy objects to the instructions given by the trial judge because there was no "knowledge charge." As the judge observed, however, it would be impossible to "intend to evade a lawful restriction" on the sale or distribution of goods without knowing that those goods were fake. It was not error for the judge to decline to instruct the jury further on mens rea (*see* Greenberg et al., New York Criminal Law § 15:29, at 792-793 [6 West's NY Prac Series 3d ed 2007] [noting that trademark counterfeiting requires criminal intent, but that knowledge that a good is counterfeit is only required for simple possession]). Jurors are presumed to have sufficient intelligence to make elementary logical inferences presupposed by the language of a charge, and defendants are therefore not "entitled to select the phraseology" to illustrate such inferences (*People v Samuels*, 99 NY2d 20, 25-26 [2002]). Here, the evidence could lead a rational juror to find beyond a reasonable doubt that Levy intended to evade a lawful restriction on the sale of goods: the Black & Yellow warehouse was searched three times for counterfeit Ford parts; Ford representatives visited on two other occasions to inventory counterfeit Ford parts; and Levy agreed to the terms of a preliminary injunction prohibiting the sale and distribution of counterfeit Ford parts.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur.

Order affirmed.