*1036 OPINION OF THE COURT
James P. McCormack, J.
The petitioners move for an order pursuant to CPLR article 78 and article XX, § 2004 of the Nassau County Charter directing the respondent to appoint members to the Nassau County Correctional Center Board of Visitors. This is the first time that this court has been asked for an order of mandamus under this section of the County Charter.
In this article 78 proceeding, petitioners seek an order of mandamus pursuant to CPLR 7803 (1), to compel County Executive Edward P Mangano to appoint seven members to the Nassau County Correctional Center Board of Visitors pursuant to article XX, § 2004 of the Nassau County Charter. The attorneys for the County of Nassau argue the petitioners lack standing; that the Nassau County Charter, article XX, § 2004 does not impose a mandatory duty on the County Executive to appoint a Board of Visitors, but rather article XX, § 2004 is discretionary in nature, and therefore not subject to a writ of mandamus pursuant to CPLR 7803 (1); and that since the current County Executive has appointed four members to the Board of Visitors, subject to legislative approval, the Board now has a quorum and the issue has been rendered moot.
This action involves the Nassau County Correctional Center (NCCC), located in East Meadow, New York. Pursuant to article XX, § 2004 of the Nassau County Charter, NCCC is operated by the Nassau County Sheriffs Department. NCCC has a maximum capacity of approximately 1,900 inmates, including pretrial detainees and convicted criminals serving sentences of up to one year. NCCC also houses federal prisoners, as well as inmates who are alternately housed from New York City and Suffolk County. In addition to approximately 1,900 beds, the NCCC operates both a medical clinic within the main facility and a prison ward in a secured wing of the Nassau University Medical Center. Petitioners Joseph Marone and Paul Nantista are inmates in NCCC. Both petitioners assert complaints about the medical treatment they have received in NCCC. Petitioner New York Civil Liberties Union (NYCLU) is involved in advocacy for inmates who complain about jail conditions.
According to the petitioners, in a period of slightly more than one year, seven inmates have died in custody and some of those deaths have been labeled preventable by state authorities. During this same time period, petitioner NYCLU has received over *1037 200 complaints from inmates relating the NCCC’s failure to provide necessary medication, failure to treat chronic and life threatening conditions, the mistreatment of inmates with disabilities and the lack of proper mental health services at the NCCC. According to the NYCLU, these complaints have escalated since Nassau County shifted the responsibility to provide medical and mental health services to an outside private contractor in June of 2011.
The history regarding inmate complaints most notably commenced in the 1980s. In 1981, the Nassau County Sheriff entered into a consent judgment with inmate plaintiffs who had filed suit complaining of unconstitutional conditions of confinement at the NCCC. Pursuant to the consent judgment, Nassau County was ordered to increase available cell space; in addition, the order contained provisions relating to medical service, food, contact visits and staffing (see Badgley v Varelas, 729 F2d 894, 896 [2d Cir 1984]). Throughout the 1980s the litigation continued, and inmates won a series of lawsuits relating to the conditions at the jail and Nassau County’s refusal to comply with the terms of the consent judgment (see Badgley v Varelas, 729 F2d 894, 896 [1984]; Badgley v Santacroce, 800 F2d 33 [2d Cir 1986]; Badgley v Santacroce, 815 F2d 888 [2d Cir 1987]; Badgley v Santacroce, 853 F2d 50 [2d Cir 1988]). In fact during this period, Judge Jon O. Newman, writing for the Second Circuit of the United States Court of Appeals, compared the conditions at the jail to a “Dickensian saga of prison overcrowding and bureaucratic excuse” (Badgley v Santacroce, 800 F2d 33, 35 [1986]).
Following the well publicized death of an inmate in 1999, the United States Department of Justice opened an investigation into the conditions at the NCCC. The Department of Justice concluded that the conditions at the NCCC rose to the level of constitutional violations due to the deliberate indifference to inmates’ serious medical needs and excessive force against inmates. In 2002, the United States Attorney General filed a complaint in the U.S. District Court for the Eastern District of New York alleging the NCCC engaged in a pattern or practice of using excessive force against inmates; failed to train and supervise correctional staff adequately to prevent the use of excessive force; failed to maintain policies pertaining to the use of force and failed to investigate complaints alleging the use of excessive force. In addition, the complaint alleged the NCCC was deliberately indifferent to the inmates’ serious medical *1038 needs; provided care by unlicensed and untrained staff; failed to ensure inmates in need of routine or acute medical care were seen by staff in a timely manner; failed to ensure inmates with chronic diseases received timely and appropriate follow-up treatment; failed to monitor or treat communicable diseases and failed to manage medication and medical records. As a result of that complaint Nassau County and the United States Department of Justice entered into a consent decree that directed the NCCC to make significant changes to its policies regarding the use of force and pertaining to medical and mental health care. The Department of Justice continued to monitor the jail until 2008.
In February 2009, the New York State Commission of Correction issued a report indicating that the NCCC was not in compliance with the minimum standards for a correctional facility. The commission recommended 25 steps that the NCCC would need to take to be in compliance with minimum standards. These steps included sanitary shower environment, laundry detergent and to stop ignoring inmate grievances.
The petitioners allege that the present situation is the culmination of a long history of the County failing to protect human rights and human life. More than 20 years ago, Nassau County attempted to address some of the systematic failures at the jail by establishing a Board of Visitors with wide ranging powers to oversee operations at the NCCC. The Board of Visitors has the authority to investigate inmate grievances, inspect the facility, examine records, create reports and advise the Sheriffs Department about changes that could improve the jail and prevent unnecessary deaths. The petitioners believe the Charter provision mandating the creation of the Board of Visitors is a non-discretionary duty of the County specifically passed in order to address the County’s history of neglecting human rights and dignity at the jail.
Petitioner NYCLU is a not-for-profit corporation with chapter offices and more than 2,400 members in Nassau County. The mission of the NYCLU is to promote human rights and the principles embodied in the Bill of Rights, the US Constitution and the New York State Constitution. The NYCLU involves itself in litigation regarding public policy advocacy for individual rights and government accountability. To that end, the Nassau County chapter office of the NYCLU maintains a dedicated phone line to the NCCC by which inmates can lodge complaints and seek legal advice from the NYCLU. They regularly meet *1039 with inmates who complain about conditions at the jail and engage in advocacy on those inmates’ behalf.
Petitioner Joseph Marone is an inmate in the NCCC who is alleged to have suffered from untreated or poorly treated medical conditions. He was injured in an accident involving the mechanical door to his NCCC cell. In addition, he claims to have developed a serious ear infection. He alleges that his injuries have not been properly treated and that his ear has never been examined by a doctor, despite weeks of pain and hearing loss. He also claims to have been given the incorrect dose of his medication at NCCC, which caused him to lose consciousness and hit his head. This incident led to injuries that required hospitalization. Petitioner Paul Nantista claims to have an untreated broken toe on his right foot, as the result of an injury suffered at NCCC. Petitioners allege that his injuries have not been properly treated and he remains in constant pain. He also believes that he has been denied his prescription blood pressure medication because the NCCC has failed to renew his prescription.
Initially, before reviewing the merits of the petition, this court must evaluate whether each of the petitioners has the requisite standing to bring this article 78 proceeding (see New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 211 [2004]). Standing is a “threshold issue” (see Matter of Hyatt v State of Cal. Franchise Tax Bd., 105 AD3d 186, 194 [2d Dept, Mar. 13, 2013]). The question of standing is critical because under common law a “court has no inherent power to right a wrong unless thereby the civil, property or personal rights of the plaintiff in the action or the petitioner in the proceeding are affected” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772 [1991], quoting Schieffelin v Komfort, 212 NY 520, 530 [1914]).
Standing is a threshold requirement for a plaintiff seeking to challenge governmental action. New York has adopted a two-part inquiry for determining whether a party has standing to challenge a governmental action (see New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211). The petitioner must show (1) an “injury-in-fact” and (2) that the alleged injury falls within “the zone of interests or concerns sought to be promoted or protected by the statutory provision under which the agency has acted” (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211).
To have sustained an “injury-in-fact,” the petitioner must show that petitioner will actually be harmed by the challenged *1040 administrative action, that is, that the injury is more than just conjectural (see New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211; see also Society of Plastics Indus. v County of Suffolk, 77 NY2d at 773). It is “special damage, different in kind and degree from the community generally” (Matter of Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d 406, 413 [1987]; Society of Plastics Indus. v County of Suffolk, 77 NY2d at 775 n 1). The requirement of injury-in-fact for standing purposes is closely aligned with policy that the courts of New York do not render advisory opinions (see Cuomo v Long Is. Light. Co., 71 NY2d 349, 354 [1988]). Thus, the alleged injury must be “personal to the party” (see Matter of Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d 579 [1998]).
The “zone of interests” test requires that the petitioner show that the injury-in-fact falls within the zone of interests sought to be promoted or protected by the statutory provision under which the agency has acted, or failed to act (Society of Plastics Indus. v County of Suffolk, 77 NY2d at 773). It ties the injury asserted by the petitioner to the government act challenged, and thus limits the pool of people who may challenge an administrative action. The requirement that a petitioner’s injury fall within the concerns of the statute ensures that a group or individual “whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purposes.” (Matter of Transactive Corp., 92 NY2d at 587, quoting Society of Plastics Indus. v County of Suffolk, 77 NY2d at 774.)
Although arguably any of the inmates at the NCCC would have the standing to sue to compel the County Executive to appoint a seven-member Board of Visitors, the petitioner prisoners have established their standing to challenge the government action by establishing that they each have an “injury-in-fact” and that the injury falls within “the zone of interests or concerns sought to be promoted or protected by the statutory provision under which the agency has acted,” or in this case, has failed to act. The New York Civil Liberties Union, however, has not made the required showing under the two-prong test.
However, in matters of “great public interest,” a “ ‘citizen may maintain a mandamus proceeding to compel a public officer to do his [or her] duty’ ” (Police Conference of N.Y. v Municipal Police Training Council, 62 AD2d 416, 417-418 [3d Dept *1041 1978], quoting Albert Elia Bldg. Co. v New York State Urban Dev. Corp., 54 AD2d 337, 341 [4th Dept 1976]; see Matter of Schenectady County Sheriffs Benevolent Assn. v McEvoy, 124 AD2d 911, 912 [3d Dept 1986]). “The office which the citizen performs is merely one of instituting a proceeding for the general benefit, the only interest necessary is that of the people at large” (Police Conference of N.Y., 62 AD2d at 417). One who is a citizen, resident and taxpayer has standing to bring an article 78 proceeding for the performance by officials of their mandatory duties, even without a personal grievance or a personal interest in the outcome (Matter of Policemen’s Benevolent Assn. of Westchester County v Board of Trustees of Vil. of Croton-on-Hudson, 21 AD2d 693 [2d Dept 1964]; Matter of Andresen v Rice, 277 NY 271 [1938]). The public interest standing of a citizen has been extended to corporations as well as other organizations (Matter of Dictaphone Corp. v O’Leary, 287 NY 491 [1942]; Albert Elia Bldg. Co., 54 AD2d 337).
In fact, as far back as the nineteenth century, the Court of Appeals held,
“[t]he writ of mandamus may, in a proper case, and in the absence of an adequate remedy by action, issue on the relation of a private individual, to redress a wrong personal to himself, or on the relation of one, who, in common with all other citizens, is interested in having some act done, of a general public nature, devolving as a duty upon a public officer or body, who refuse to perform it. The collection of a tax, legally assessed, in which all the inhabitants of any political division of the State have a common interest, is an instance of this character, and such collection may be enforced by any one of such citizens” (People v Halsey, 37 NY 344, 346-347 [1867]).
More recently, at the turn of the last century, the Appellate Division, Second Department, held that every citizen has a right to compel the performance by public officers of the duty imposed upon them of executing laws of the state which are enacted for the benefit of the community, and that any citizen might apply to the court for a writ of mandamus, “where the act omitted to be performed affects the public interests generally, and all citizens are equally concerned in securing its performance, and that has been enjoined by a law of the State” (see People ex rel. Kay v Swanstrom, 79 App Div 94, 97 [2d Dept 1903]). Such public interest standing has been conferred upon *1042 veterans who were not eligible for certain veteran’s preferences, but who were granted standing to challenge a state agency’s misapplication of mandatory veteran’s preferences (see Matter of Cash v Bates, 301 NY 258 [1950]); upon citizens to challenge the state’s failure to establish regulations regarding the height of a police officer (see Police Conference of N.Y., 62 AD2d 416); and upon citizens to stop an elected official from performing same-sex marriages without a marriage license (see Matter of Hebel v West, 25 AD3d 172 [3d Dept 2005]). As such, the petitioners, Joseph Marone and Paul Nantista, each have standing to petition for a writ of mandamus under the doctrine of “public interest” standing. In light of the court’s decision as to the inmate petitioners, it is not necessary to address whether the NYCLU has standing under the doctrine of “public interest” to bring the present writ. Moving now to the merits of the petition.
In 1990, the Nassau County Board of Supervisors passed legislation to create a Board of Visitors oversight committee with authority over the NCCC. The Board of Visitors had been recommended by both a consultant study on the jail and by the State in response to long-standing systemic problems at the jail. Since the enactment of article XX, § 2004 in 1990, no county executive, including former County Executives Thomas S. Gulotta and Thomas R. Suozzi as well as present County Executive Edward P Mangano, has ever appointed seven members to the Board and the Board has never met.
Nassau County Charter article XX, § 2004 was enacted August 28, 1990. Section 2004 provides that the County Executive shall appoint seven Nassau County residents as a Board of Visitors to NCCC, and that such appointments must be approved by the Nassau County Legislature. Nassau County Charter article XX, § 2004 (f) grants the Board the powers and duties, inter alia, to investigate inmates’ written complaints and grievances, to advise the Sheriff in developing programs for improving NCCC services and duties with respect to inmate care, treatment, safety, rehabilitation, recreation, training and education, and to report and make recommendations to the Sheriff as necessary to fulfill the Board’s powers and duties. The members of the Board of Visitors serve without compensation.
The Nassau County Charter § 2004 states that
“Nassau County Correctional Center Board of Visitors; membership; appointment, compensation and expenses; power and duties.
*1043 “a. There shall be within the Division of Corrections a Nassau County Correctional Center Board of Visitors. It shall consist of seven members, including a chairperson, each of whom shall be appointed by the County Executive subject to confirmation by the County Legislature. As far as may be practicable, the members shall possess a working knowledge of the correctional system.
“b. All members of the Board shall be Nassau County residents.
“c. All members of the Board shall be voting members.
“d. The term of office of each member shall be three years, except that members first appointed shall be appointed as follows: four for a term of one year, two for a term of two years, and one for a term of three years. Upon expiration of the term of office of any member, his successor shall be appointed for a term of three years. Any appointed member of the Board may be removed by the County Executive for cause after an opportunity to be heard in his defense. Any member chosen to fill a vacancy created other than by expiration of term shall be appointed for the unexpired term of the member whom he is to succeed. Vacancies caused by the expiration of term or otherwise shall be filled in the same manner as original appointments.
“e. Members shall serve without compensation. The Board of Supervisors may appropriate sufficient sums to meet the expenses actually and necessarily incurred by members of the Board in the performance of their duties hereunder.
“f. The Board and each member thereof shall have the following powers and duties:
“1. To investigate, review or take such other actions as shall be deemed necessary or proper with respect to inmate complaints or grievances regarding the correctional center as shall be called to their attention in writing.
“2. To have access to the correctional center and all books, records and data pertaining to the correctional center which are deemed necessary for carrying out the Board’s powers and duties.
“3. To obtain from correctional center personnel any information deemed necessary to carry out the *1044 Board’s powers and duties.
“4. To request and receive temporary office space in the correctional center for the purpose of carrying out the Board’s powers and duties.
“5. To report periodically to the Sheriff and, where appropriate, to make such recommendations to the Sheriff as are necessary to fulfill the purposes of this section.
“6. To advise the Sheriff in developing programs for improving correctional center services and duties and for coordinating the efforts of correctional center officials in respect to improving conditions of inmate care, treatment, safety, rehabilitation, recreation, training and education.
“7. To meet on a regular basis at a time and place designated by the Chairman of the Board.”
The respondents argue that an article 78 proceeding seeking an order of mandamus is inappropriate because notwithstanding the words “shall be appointed” in section 2004 (a), the County Executive has discretion to select members of the Board of Visitors, and mandamus is only appropriate to compel ministerial, non-discretionary, nonjudgmental acts. This identical argument was unsuccessfully advanced by the County in Matter of Korn v Gulotta (72 NY2d 363 [1988]). It is well settled that “ ‘[w]here the language of a statute is clear and unambiguous, courts must give effect to its plain meaning’ ” (People v Kisina, 14 NY3d 153, 158 [2010]; see People v Williams, 19 NY3d 100, 103 [2012]). Likewise, “statutory interpretation always begins with the words of the statute” (People v Levy, 15 NY3d 510, 515 [2010]).
In Matter of Korn v Gulotta (72 NY2d 363 [1988]), an individual taxpayer challenged the acts of then County Executive Thomas Gulotta, and argued that he had neglected to include something in the budget that was mandated by the Nassau County Charter enacted by the state legislature in 1936. At issue in that matter was a Charter provision providing that “[t]he proposed county budget shall contain ... a statement of the estimated cash balance” (Nassau County Charter § 302 [5] [emphasis added]). The Court of Appeals rejected the County’s argument, that notwithstanding the word “shall,” the provision was actually discretionary; rather the Court of Appeals found the provisions (of section 302) were mandatory (see Matter of Korn v Gulotta, 72 NY2d at 373).
*1045 “It is well settled that the remedy of mandamus is available to compel a governmental entity or officer to perform a ministerial duty, but does not lie to compel an act which involves an exercise of judgment or discretion ... A party seeking mandamus must show a clear legal right to relief” (Matter of People v Christensen, 77 AD3d 174, 193 [2d Dept 2010], quoting Matter of Brusco v Braun, 84 NY2d 674, 679 [1994]; see New York Civ. Liberties Union v State of New York, 4 NY3d 175, 183-184 [2005]).
“Mandamus is available . . . only to enforce a clear legal right where the public official has failed to perform a duty enjoined by law” (New York Civ. Liberties Union v State of New York, 4 NY3d at 184; see CPLR 7803 [1]). “[M]andamus does not lie to enforce the performance of a duty that is discretionary, as opposed to ministerial” (Matter of Alltow, Inc. v Village of Wappingers Falls, 94 AD3d 879, 880 [2d Dept 2012]). “A discretionary act ‘involve[s] the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result’ ” (New York Civ. Liberties Union v State of New York, 4 NY3d at 184, quoting Tango v Tulevech, 61 NY2d 34, 41 [1983]). However, “[m]andamus will lie to compel acts that public officials are duty bound to perform regardless of how they may exercise their discretion in doing so” (Matter of Korn v Gulotta, 72 NY2d at 370; see Klostermann v Cuomo, 61 NY2d 525, 539-540 [1984]).
Thus, in the instant case, while mandamus may lie to compel respondents to fill the Board of Visitors, it would not be appropriate to compel the County Executive to appoint specific members to the Board (see Matter of Kupersmith v Public Health Council of State of N.Y., 101 AD2d 918 [3d Dept 1984]). Although the County is correct in its argument that the act of appointing specific Board members involves some level of discretion, it is incorrect in asserting that the act of filling the Board itself is discretionary. The language of the Charter is unequivocal and it clearly directs the County Executive to fill the seven-member Board of Visitors in a manner consistent with Nassau County Charter § 2004 (a), (b), (c), (d) and (e).
Finally, respondents argue that the County Executive’s recent submission of four names to the nominations committee of the Nassau County Legislature renders this petition moot. Additionally, they argue General Construction Law § 41, which allows a four-member quorum of a seven-member body to *1046 exercise the full power of the body, relieves them of their duty to fill this seven-member board. These arguments are unavailing.
General Construction Law § 41 provides:
“Whenever three or more public officers are given any power or authority, or three or more persons are charged with any public duty to be performed or exercised by them jointly or as a board or similar body, a majority of the whole number of such persons or officers, gathered together in the presence of each other or through the use of videoconferencing, at a meeting duly held at a time fixed by law, or by any by-law duly adopted by such board or body, or at any duly adjourned meeting of such meeting, or at any meeting duly held upon reasonable notice to all of them, shall constitute a quorum and not less than a majority of the whole number may perform and exercise such power, authority or duty. For the purpose of this provision the words ‘whole number’ shall be construed to mean the total number which the board, commission, body or other group of persons or officers would have were there no vacancies and were none of the persons or officers disqualified from acting.”
“ ‘Where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning’ ” (People v Kisina, 14 NY3d 153, 158 [2010]; see People v Williams, 19 NY3d 100, 103 [2012]). The Charter itself explicitly mandates that the Board of Visitors “shall consist of seven members, including a chairperson, each of whom shall be appointed by the County Executive subject to confirmation by the County Legislature.” The word “shall” is clearly a directive, not a suggestion (People v Levy, 15 NY3d 510, 515 [2010]). The Charter does not mandate that the County Executive create a quorum of a seven-member board by establishing a four-member board which could vote in the absence of three of the members of a seven-member board. Presumably, if that were the intention of the Board of Supervisors, they would have drafted the Charter to include a four-member board with powers to act as a seven-member board.
Regardless, the issue would only be moot if in fact the County Executive submitted the requisite number of names to the legislature and they were approved. There is no evidence that the names were ever approved; more importantly, as the terms of the former Board members have likely expired without fur *1047 ther reappointment, the four names submitted to committee for consideration are of no moment, as they fail to establish a seven-member board.
Accordingly, this court will exercise its mandamus power and it is hereby; ordered, that the County Executive appoint a Board of Visitors consistent with the mandates of the County Charter § 2004; and it is further; ordered, that the County Executive submit the number of names required to constitute a seven-member Board of Visitors within 90 days of the entry of this order.